9 N.J. Super. 70 (1950)
74 A.2d 902
MARGARET KRESS, PLAINTIFF-APPELLANT,
v.
CITY OF NEWARK, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued June 26, 1950.
Decided July 26, 1950.
*72 Before Judges McGEEHAN, COLIE and EASTWOOD.
Mr. John A. Laird argued the cause for appellant (Mr. David Roskein, attorney).
Mr. Charles Handler argued the cause for respondent.
The opinion of the court was delivered by COLIE, J.A.D.
Plaintiff appeals from a judgment dismissing her action against the defendant municipality to recover damages for injuries which she sustained as a result of over-exposure while performing duties as technician in the X-ray department of the Newark City Hospital. The complaint was grounded upon the failure to provide a reasonably safe place to work.
The plaintiff's case disclosed that she was first employed at City Hospital as a maid in 1933. The following year she was assigned to the X-ray department, her duties being to escort patients to and from the X-ray room and to prepare *73 them for photographing. She continued in this work until 1938 when her assignment was changed to the dark room, developing the plates. Up to 1941 or 1942 when made technician, her exposure to X-rays was minimal. The doctor in charge of the department told her that it was difficult to get a technician and asked her if she would "learn the machines and so I went out and I was fixing the patients up for X-rays and I used to watch the technician, what she did and you catch on after a while and so I went out and learned the X-rays and they put me out on the machines * * *. I had no training whatsoever." She testified that no instructions or warnings were given to her; that from 1942 she operated a portable machine in the wards and in the X-ray department; that no safety devices were furnished and that the work required her to stand across the table from the patient during the exposure of the film. In addition she took dental X-rays and often held the film in position during the exposure. This occurred as often as sixty times a week for several years. She was given no warning with reference to danger from holding her hand in the X-ray beam. She never had a blood count excepting on the occasion of an operation. On one occasion in 1943 or 1944 a doctor suggested that a monitor film be, and it was, attached to her uniform; the purpose being to ascertain whether the wearer was being exposed to bombardment by the X-rays. Upon developing, the monitor film showed the presence of the rays. In 1945 or 1946 the plaintiff noticed spots on her hands and upon showing them to the chief of the X-ray department, he suggested that she use cold cream, vaseline and something oily on her hands. In August, 1946, while X-raying a patient, the latter ripped the plaintiff's finger. Upon reporting this incident, a biopsy was done and after analysis she was sent to a Dr. McNair at Memorial Hospital in New York. Since then she has done no work in the X-ray department. She was referred for treatment to Dr. Lyndon A. Peer who performed a conservative removal of some of the lesions in September, 1946, at which time an earlier diagnosis of skin cancer was reaffirmed. In *74 February, 1947, a further operation was performed, followed in 1949 by a more radical operation necessitating removal of the whole surface of the hand down to the tendon sheath. The prognosis is dismal. Amputation may have to follow with no guarantee that the cancer will be arrested. Dr. Peer testified that the condition he observed and for which he operated "would fit into that general picture," i.e., characteristic of X-ray exposure. Dr. Harrison S. Martland diagnosed the condition as "dermatitis due to undue exposure to X-ray." There was evidence from Dr. Arthur Mutcheller, a bio-physicist and radio-physicist, specializing for the past twenty years in the effect of radiation upon living material, that standard practice in the use of a portable X-ray machine calls for a protection screen for the operator and in the case of dental X-rays standard safety regulations required a lead screen and that the technician refrain from holding the film in position and thereby exposing the hands repeatedly to the primary rays.
On behalf of the defendant there was testimony that the equipment and protection methods were standard; that plaintiff had been warned of the dangers and adequately instructed and that she failed to utilize the protective devices furnished for her. Dr. Santora called by the defendant testified that no lead screen was provided for use with the mobile unit when it was used in the wards. Dr. Henley testified that the screens were not mobile, and when asked the question "So, when the operator was compelled to take photographs, X-ray photographs, outside of the presence of the X-ray room, this operator then would have no screen as a guard, is that correct?" answered, "No, they do not have anything hardly that I know of." From this synopsis of the testimony it clearly appears that fact questions were raised for the consideration of the jury unless the law is such as to preclude the submission of the case to the jury.
On behalf of the City it is argued that the plaintiff has failed to sustain the burden of establishing the defendant's negligence, and further argued that she was guilty of contributory *75 negligence. These questions are also questions properly to be decided by a jury.
The next point is that the judgment should be affirmed because of the failure of the plaintiff to prove active wrongdoing upon the part of the municipality. In Allas v. Rumson, 115 N.J.L. 593 (E. & A. 1935), the defense was raised and argued that the municipality was not liable to respond in damages because there was no active wrongdoing by it while engaged in the performance of a governmental function. The court pointed out that the difficulty with the rule lay in its application to a particular case and said that the true distinction was whether there was a wrongful act or positive misfeasance as distinguished from mere negligence, that there must be a positive affirmative act wrongful in itself in order to impose liability upon the municipality. In that case the Borough of Rumson had constructed a sloping ramp without guard rails, barriers or other protective devices. The holding of the court was that the Borough was the active agent or instrument in the creation of a condition perilous to human safety and responsible for the dangerous construction which constituted an ever present menace to the safety of users of the premises. It said that the act was one of positive misfeasance and defined the latter term as "the wrongful and injurious exercise of lawful authority." Accepting that definition as a correct statement of the law and applying it to the instant case, we find that the City of Newark was engaging in a lawful enterprise in operating the hospital, that it was exercising lawful authority when it purchased the mobile X-ray equipment, but it appears to us that when the municipality put the X-ray machine in operation without a lead screen, without giving adequate instruction to operators, without the periodic use of monitor films on the operator, without providing adequate protective gloves and aprons, if the jury finds as a fact that it failed so to do, then such conduct was "active wrongdoing" within the meaning of the holding in Allas v. Rumson, supra. We are unable to distinguish in principle or reason any difference in the neglect to provide *76 protective barriers to prevent persons from falling into an unguarded depression and the failure to provide standard protective measures to safeguard the users of the X-ray machine from the harmful effect of undue exposure thereto. In fact, reason and good conscience, this is particularly so where the instrumentalities involved are what may properly be termed as dangerous agencies. As was said in Rakowski v. Raybestos-Manhattan, Inc., 5 N.J. Super. 203 (App. Div. 1949), "A higher degree of care is required in dealing with a dangerous agency than in the ordinary affairs of life or business which involve little or no risk. The law exacts of one who puts a force in motion that he shall control it with a skill and care in proportion to the danger created and with appliances which, in view of the circumstances, are reasonably safe. In other words, the essential requirement of due care under the circumstances necessarily implies that the care required to prevent injury to others in using a dangerous instrumentality is a great or high degree and every reasonable precaution suggested by experience and the known dangers of the subject ought to be taken. * * * Every peril, it is safe to say, including such as are termed `latent' or `hidden,' need not be discovered, since liability for negligence in keeping a dangerous instrumentality is not absolute. If, however, common experience has demonstrated that dangers lurk in the method adopted or in the instrumentality maintained by a person, he rests under the obligation of ascertaining the peril and taking precautions to avoid injury therefrom." (Italics ours.) In the instant case the proof is clear that the municipality was aware that dangers lurked in the instrumentality and in failing to take proper precautions to avoid injury therefrom, the City was guilty of active wrongdoing, as our courts have construed it in Allas v. Rumson, supra, and in Fratello v. Newark, 133 N.J.L. 19 (E. & A. 1945). Cf. Milstrey v. City of Hackensack, 8 N.J. Super. 221 (App. Div. 1950).
It is next argued that since the Newark City Hospital was a charitable institution, therefore the City was not liable *77 for the negligence of its agents. In D'Amato v. Orange Memorial Hospital, 101 N.J.L. 61 (E. & A. 1925), it was held that a charitable institution was immune from liability to a patient arising from the negligence of its agent. The rule has been extended to embrace the mother of a patient. Boeckel v. Orange Memorial Hospital, 108 N.J.L. 453 (Sup. Ct. 1932). In Simmons v. Wiley M.E. Church, 112 Id. 129 (E. & A. 1934), the rule exempting charitable institutions from liability for the negligence of its servant or agent was held inapplicable to a stranger having no beneficial relation to the charity at the time of the injury. Mr. Justice Trenchard said: "It may well be sound public policy to avoid a diversion of trust funds from the direct object of their charitable donor by forbidding their application to damages for the negligence of the charity's servants where the injured party participates in the charity's bounty, but no charitable organization, no matter how lofty in character the motive or purpose, should be permitted with impunity to set up and operate machinery and thereby injure by negligence those unconcerned in and unrelated to that which the donor brought into being or supports in operation." The limitation of the rule above set forth was approved and followed in Rose v. Raleigh Fitkin, etc., Foundation, 136 N.J.L. 553 (E. & A. 1948). The plaintiff in the instant case while she may have obtained an advantage by her employment, nevertheless gave her services as a consideration for the remuneration which she received from her employment and was in no proper sense a beneficiary of the charity.
The judgment under appeal is reversed.